1

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF VIRGINIA
2                 ALEXANDRIA DIVISION

3   UNITED STATES OF AMERICA,    )  Case 1:14-cr-00397
                                 )
4              Plaintiff,         )
                                 )
5        v.                       )  Alexandria, Virginia
                                 )  August 14, 2015
6   HANOCH DAVID STEIN,          )  9:32 a.m.
                                 )
7              Defendant.         )
                                 )  Pages 1 - 33
8   _____

9              TRANSCRIPT OF SENTENCING

10       BEFORE THE HONORABLE ANTHONY J. TRENGA

11        UNITED STATES DISTRICT COURT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25    COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFF:

 3        KELLEN S. DWYER, ESQUIRE
          OFFICE OF THE UNITED STATES ATTORNEY
 4        2100 Jamieson Avenue
          Alexandria, Virginia  22314
 5        (703) 299-3700

 6   FOR THE DEFENDANT:

 7        ARI S. CASPER, ESQUIRE
          THE CASPER FIRM, LLC
 8        One South Street, 27th Floor
          Baltimore, Maryland  21202
 9        (410) 989-5097

10        ERIN L. BLANCH, ESQUIRE
          BRIGLIA HUNDLEY, PC
11        1921 Gallows Road, Suite 750
          Tysons Corner, Virginia  22182
12        (703) 883-0880

13   THE DEFENDANT, HANOCH DAVID STEIN, IN PERSON

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  Criminal Case 1:14-cr-397, *United*
2  *States of America v. Hanoch David Stein*.

3          Will counsel please identify themselves for
4  the record.

5          MR. DWYER:  Good morning, Your Honor.  Kellen
6  Dwyer for the United States.  With me at counsel table
7  is Special Agent Mike Kurisky of the FDA.

8          THE COURT:  Good morning.

9          MS. BLANCH:  Good morning, Your Honor.  Erin
10  Blanch serving as local counsel in this case.  Mr. Ari
11  Casper has already been admitted *pro hac vice*, and
12  he'll be arguing on behalf of Mr. Stein.

13          THE COURT:  All right.

14          MR. CASPER:  Good morning, Your Honor.  Ari
15  Casper on behalf of Defendant Hanoch David Stein.

16          THE COURT:  All right.  Welcome Mr. Casper.

17          We're here for sentencing.

18          Mr. Casper, have you provided a copy of the
19  presentence report to Mr. Stein, and have you reviewed
20  it with him?

21          MR. CASPER:  Yes, Your Honor.

22          THE COURT:  Any objections to the presentence
23  report other than what you've put in your filings?

24          MR. CASPER:  No, not in addition to what
25  we've put in our filings.

1          THE COURT:  All right.  Would you like me to

2   hear further on your objections?

3          MR. CASPER:  Yes.  I won't redo everything we

4   said, but there are a couple of things that I wanted to

5   point out that are noteworthy.  The three primary

6   objections resolve around, one, the issue of safety in

7   this case.  I think it's very important that everybody

8   understand what happened here.  Two is his role, and

9   three is, obviously, the loss amount.  I'll be brief on

10  all of them.

11         THE COURT:  All right.

12         MR. CASPER:  In the government's sentencing

13  memorandum, they point out on page 3 -- it says, As an

14  initial matter, the defendant had experience working

15  for a licensed distributor of prescription drugs at a

16  company called North American Dental.  The defendant

17  was thus well aware of licensing, shipping, and storage

18  regulations that govern the distribution of

19  prescription drugs.

20         And I think that it's this misunderstanding

21  that's caused -- there was a lot of briefing on this

22  sentencing.  Mr. Stein fully accepts responsibility for

23  his conduct.  He's here because he pled guilty, and

24  he's very remorseful.  You'll hear from him later.  But

25  I think it's very important to have context in terms of

1  the guideline range is that that statement from the

2  government is inaccurate because what Mr. Stein does

3  during the day is he runs a warehouse for a dental

4  supply company, a wholesale company.  They don't deal

5  with prescription drugs.  And so the notion of

6  licensing and how that works is very foreign to him.

7           This company does parallel imports, which,

8  you know, in some circles is known as gray market,

9  which I know the Court is familiar with.  And what

10 happens in that world is the companies make money based

11 on a spread of goods that are either intended to be

12 sold overseas, brought back to the United States, and

13 they're sold here for much more.  For example, you

14 could have a product that's $100 sold in Nigeria, but

15 they sell it here for $500.  So this parallel imports,

16 they bring that here, and that spread marks a

17 difference.  That's how they make money.

18          The dental supply companies and a lot of

19 companies, that's how they do that.  That's legal.

20 There's nothing illegal about that.  They call it

21 parallel imports, and they call it gray market because

22 it's gray because you're bringing things back.  But the

23 whole issue there is the manufacturers get upset at

24 that process.  So there's a bit of a cat-and-mouse game

25 that they play, but those are civil suits.  Those

1  aren't criminal suits.

2         So the reason I raise it is because Mr. Stein

3  had no dealings with prescription drugs at all.  That

4  doesn't mean that he didn't learn what happened during

5  this process, and it doesn't mean that he's not

6  accepting responsibility.  But when you talk about the

7  loss amount in this case under the guideline range, you

8  have to look at what he really thought was happening,

9  what was reasonably foreseeable to Mr. Stein and what

10 he thought.

11        And what he thought was that this company, TC

12 Medical, was really capitalizing on the gray market.

13 He understood that there were things happening, and

14 then, ultimately, he learned what was going on with

15 drugs being imported.  He got a letter from the

16 California Board of Pharmacy.  He got some things that

17 opened his eyes to it.  At that point, he should have

18 done the right thing, and he didn't.  He's here to

19 accept responsibility for that.

20        But in terms of a loss amount, the government

21 has argued that he should be on the hook for

22 $13 million because that's what went through his

23 warehouse.  Quite frankly, there's no way he could

24 reasonably foresee that.  He didn't deal with the

25 dollars of it.  He didn't market it.  He didn't sell

1    it.  He had nothing to do with any of that.  He was

2    basically doing at night for an hour what he was doing

3    at his day job.  He was paid $15 a box.

4              THE COURT:  This goes to which objection?

5              MR. CASPER:  This goes to the loss amount.

6              THE COURT:  Use of the $13 million as the

7    proxy for loss?

8              MR. CASPER:  Correct.  That goes to the

9    objection to paragraph 62.

10             THE COURT:  All right.

11             MR. CASPER:  The other thing I want to

12   address is the safety concern, paragraph 51 of the PSR

13   where the probation officer concedes that the

14   government doesn't have information on specific harms

15   inflicted on any of these patients.  I think it's

16   important here because the safety issue is a big one.

17             Mr. Stein, his efforts were to try and keep

18   these items cold.  He was told by David Burke, who was

19   the head of this -- or one of the heads of the

20   organization, that you had two to six weeks to make

21   these things happen.  There's no evidence in this case

22   that people were sick.  And if there is evidence of

23   that other than some random e-mail, there's no evidence

24   that Mr. Stein knew about it.  I just wanted to put

25   that in perspective as we go forward.

1              THE COURT:  All right.

2              MR. CASPER:  Thank you.

3              THE COURT:  Thank you.

4              Counsel, any objections to the presentence

5 report?

6              MR. DWYER:  No objections, Your Honor.  I

7 would like to respond to --

8              THE COURT:  Would you like to respond to the

9 objections?  Go ahead.

10              MR. DWYER:  -- the objections and some of the

11 things that were in the sentencing memorandum and were

12 just said.

13              THE COURT:  All right.

14              MR. DWYER:  First, it says in the presentence

15 report -- or in the defendant's sentencing

16 memorandum -- and you've somewhat heard it echoed just

17 now -- that there's no proof this wasn't safe.  He

18 actually says in the sentencing memorandum that because

19 TC Medical had repeat customers, that proves that the

20 drugs were safe and effective when they kept coming

21 back.

22              You know, Mr. Stein had made the

23 determination on behalf of tens of thousands of

24 American patients that the FDA regulations are really

25 just kind of red tape and that, you know, the drugs he

1    sold were basically the same thing and were essentially

2    safe.  That wasn't his determination to make.  It's the

3    FDA's job to decide whether misbranded drugs are safe

4    or not and what should be approved and what warnings

5    and labels are necessary.  Mr. Stein ignored those

6    objections and continues, based on his sentencing

7    memorandum and based on what counsel just said, to say,

8    Well, you know, if you can't point me to someone

9    directly who was harmed by this, then it was basically

10   safe, and it wasn't really that big of a deal.

11           There is evidence of an e-mail of someone, a

12   medical professional, who complained to TC Medical that

13   five out of the ten patients who used their Botox had

14   severe reactions and some had to go to the emergency

15   room.  But beyond that, the reason why there's not kind

16   of explicit evidence of who was harmed by this is

17   because TC Medical was not a legitimate drug company

18   and didn't track and report adverse reactions to their

19   drugs.  Doctors who were involved in buying this stuff,

20   most of them knew they were complicit in a crime and,

21   of course, then aren't going to report to the FDA or to

22   any authorities if something bad happens.

23           So Mr. Stein doesn't get to engage in illegal

24   drug distribution and then come to the Court and say,

25   Well, because you can't prove that my black market

1    activity caused harm, then I shouldn't be significantly

2    punished.

3            Secondly, there's claims in the sentencing

4    memorandum and just now that Mr. Stein was, quote,

5    vigilant in his care for products which required

6    refrigeration and perfected the shipping of these

7    products so they would arrive at their destination cold

8    and dry.  That's on page 7 of the sentencing memo.

9    That's flatly contradicted by the statement of facts

10   which is repeated at page 16 of the presentence report.

11   That goes through several e-mails in which customers

12   are complaining that products shipped by Mr. Stein were

13   arriving warm and often wet.

14           There's also photos of Mr. Stein's basement

15   which is in -- I provided a courtesy copy of a slide

16   presentation yesterday.  I could pass up another one to

17   make sure Your Honor has it.  I provided it to defense

18   counsel as well.

19       (Documents are passed up to the Court.)

20           THE COURT:  I have that, but I'll take it.

21           MR. DWYER:  On the second page, this is a

22   photo that was taken of Mr. Stein's refrigerator during

23   the search warrant.  On the left there -- on the right,

24   you'll see this is just a normal refrigerator with

25   mayonnaise.  On the left is a drug called Lucentis,

1  which is used to treat macular degeneration of the eye

2  and is actually injected into a patient's eyeball.

3  This is what he's storing in his refrigerator.  This is

4  not someone who has perfected the art of taking care of

5  prescription drugs.  This is someone who was reckless

6  about it.  There's more photos on the next few pages.

7  I won't go through one by one, but you get the idea.

8          That goes to kind of the knowledge of

9  illegality.  The idea that he says in his sentencing

10 memorandum that at first he was unaware of the

11 illegality of TC Medical's activities and only slowly

12 began to realize that it was operating illegally --

13 Mr. Casper said a moment ago that he wasn't really an

14 expert in licensure because that wasn't exactly what

15 his day job was.  I mean, you don't have to be an

16 expert to know that you're not allowed to keep eye

17 injections in your refrigerator.

18          There's all sorts of evidence of

19 consciousness of guilt.  If you look at the first page

20 of the presentation, Mr. Stein had four locations at

21 which he would ship drugs to under fake names.  He used

22 Albert Simmins at one location, Joe Spiro at another.

23 He used a friend, Avi Thav, to receive at another

24 location.  They would all be consolidated at his

25 residence in his basement and then shipped out.  There

1   was no reason to do this unless you know what you're

2   doing is illegal.

3           Finally, Your Honor, if you turn to page 6 of

4   the presentation, these are warning letters Mr. Stein

5   repeatedly got from the FDA, the first one coming as

6   early as November 2011.  What the FDA does is if it

7   detains a product at the border that is illegal and

8   can't come into the country, they'll send you a notice

9   saying, This product is intended for you, and we

10  believe it's illegal.  If you disagree, you can come

11  file something; otherwise, we're going to destroy it or

12  send it back.

13          He got several of these letters and ignored

14  them.  The next page is one from the California Board

15  of Pharmacy.  That's a cease and desist letter.  The

16  page after that, page 8, is an e-mail informing him

17  that a client got a similar letter from the FDA and no

18  longer wants to buy with us.  It goes on and on.  The

19  next page he's instructed to make sure that the drugs

20  are clean, meaning that they don't have the Netherlands

21  symbols on it.  The final page is a picture of one of

22  the drugs that was found in Mr. Stein's house where it

23  was taken a photograph of and e-mailed.  That clearly

24  says intended for Philippines use only.

25          So there's really not -- it's kind of a

1  little bit concerning that Mr. Stein would still come

2  in and say, Well, I didn't know at first it was

3  illegal.  I slowly began to realize it, and my only

4  mistake was not getting out soon enough.  That's not

5  the nature of the conspiracy.  I just wanted to make

6  that very clear for the record.

7                THE COURT:  All right.

8                MR. DWYER:  Thank you.

9                THE COURT:  Do you want to speak any further

10 to sentencing objectives?

11               MR. DWYER:  No, Your Honor.

12               Just on the loss amount, the $13 million.

13 The conspiracy was $30 million.  The $13 million is

14 just what Mr. Stein physically picked up and shipped

15 out.  So the idea that he's being held responsible for

16 somebody else's conduct or for something he didn't know

17 what he was doing is just not supported by the record.

18               THE COURT:  All right.  Thank you.

19               Mr. Casper.

20               MR. CASPER:  Would you like me to address

21 sentencing generally?

22               THE COURT:  Yes.

23               MR. CASPER:  Your Honor, I would just point

24 out that if you saw the bigger picture of the basement,

25 there were a lot of refrigerators there.  There's never

1    been an allegation that Mr. Stein wasn't trying to keep

2    these things cold and trying to get these -- he doesn't

3    deny that he was involved in a crime, and he's

4    completely accepting responsibility. I just wanted to

5    give it some context.

6            The fact that he comes here today with no

7    criminal history and he didn't seek out this conduct --

8    he was sought out because he manages a warehouse at

9    this dental supply company. Yes, he did learn it was

10   illegal, and he accepted responsibility.

11           But as you can see from the letters that were

12   submitted on his behalf, he takes care of a lot of

13   people, including his 11-year-old daughter, his ex-wife

14   even though there's no agreement to do so.

15           His boss is here today, Jill Kalfa. His

16   ex-wife is here today, Merav, who wrote a letter. His

17   daughter -- we made a decision. Obviously, Mr. Stein

18   didn't want to bring her today. His parents would be

19   here. His mother is battling cancer in Israel. He has

20   other friends here and supporters, Yosef Kushner who

21   also wrote a letter.

22           He's very well liked in the community. He

23   does a lot of good in the community. He volunteers

24   running a warehouse Thursday night with a group that

25   delivers packages to the poor. So from a humanistic

1  standpoint, he's not your typical person who is here in

2  front of Your Honor, and we wanted to make that known.

3          In terms of his role in the conspiracy, he --

4  I argued loss amount.  I'm not going to argue that

5  again.  But in terms of his role, the government, I

6  think, has overstated -- and I say that respectfully --

7  his role in this conspiracy.  I mean, he was doing what

8  Rivka Rabi was doing in New Jersey.  There were people

9  in Florida doing what he was doing.  When he went on

10 vacation, he asked a friend to help out and do this.

11          He had no role in managing this.  He didn't

12 hatch this idea.  He didn't even manage the other

13 people who were doing shipping.  So the notion that

14 he's number three from Lexier, Burke, and then

15 Mr. Stein seems to overstate his role.

16          THE COURT:  I have one factual question that

17 was raised by the statement of facts in

18 Mr. Ibrahimian's statement of facts; that is, that on

19 July 13, 2013, a letter was sent to a customer over

20 Mr. Stein's signature as Albert Simmins where he was

21 identified as coming from the chief operations office.

22 Is that something that he was aware of?

23          MR. CASPER:  No.  He didn't send that letter,

24 and nobody contends that he did send the letter.

25          THE COURT:  Well, I understand he didn't send

1  it, but was he aware that he was being held out in that

2  capacity?

3          MR. CASPER:  No.  He did know that Simmins

4  was a name they were attributing in terms of the

5  shipping.  As I explained earlier, some of that was the

6  gray market, and some of it was he knew that this

7  wasn't supposed to be coming in this way.  But he was

8  not held out as any kind of manager in any capacity.

9  He never knew that letter went out until he saw the

10  indictment.

11          THE COURT:  All right.

12          MR. CASPER:  So in his role, he's being

13  painted as kind of overseeing this entire process.  I

14  think it's fair to say that he never met Rivka Rabi,

15  didn't even know her name until this whole thing

16  happened.  There were people in Florida.  He wasn't

17  dealing with any of these people.  They would ship

18  things to him, but it wasn't as if he had the position

19  in the company that they say he did.  He was never

20  involved in any type of sales.  He never went out and

21  marketed to other people that -- you know, that these

22  drugs are safe, effective, whatever they may be.  His

23  role was merely to get the product in.  He got his

24  instructions where to send it, how to send it.

25          Although you will see text messages and

1  e-mails talking about products arriving warm, you will
2  see also that Mr. Stein was trying to get things there
3  cold and doing the best he can to do that.  That
4  doesn't mean that he thought that this picture of the
5  stuff in his refrigerator next to the Hellmann's was
6  the way this should be stored.  We're not denying that.
7  But it's a different story than someone who is actively
8  just recklessly disregarding and sending these things
9  out and they're warm and he doesn't care.
10           There's also texts and e-mails that we
11  submitted and the government has also submitted that
12  actually say, Hey, this is warm.  What do I do with
13  this?  He e-mails Burke, and you'll see he never does
14  anything without being told what to do.  In this whole
15  process, what do I do?  This came in warm.  Burke would
16  tell him, That's okay for two to six weeks; send it
17  out.  And that's borne out in all of the 7 million
18  pages of documents that we went through.
19           So we would ask that he be treated like the
20  Rivka Rabi's of the world, the people in Florida, and
21  the others.
22           Now, agreed, we're not challenging the
23  $13 million worth of product that may have gone through
24  his warehouse.  We stipulated that because there's no
25  way for us to track that.  But he had no way to know

1  what that was.  The fact that he had $13 million and

2  somebody like Ms. Rabi had $4 million is only a

3  function of the fact that he was doing it longer.

4        And I think she made a third of what he had.

5  He made $174,000 over that several-year period.  But I

6  don't think by virtue of the fact that he was in it

7  earlier makes him in such a different role than these

8  others, some of whom received very favorable sentences,

9  others who weren't indicted at all and we'll never hear

10  about.  So I think he should be treated as they were

11  treated.

12        You know, when I was sitting on the other

13  side of the table years ago as a prosecutor, we used to

14  look at what's this picture going to look like ten

15  years from now.  We'd come to court humbly -- and

16  you'll hear from Mr. Stein in a minute, but he asks --

17  there's two ways this could go.  One, you know, if he's

18  incarcerated, he will lose his job.  He will not see

19  his daughter.  He will be unable to support his

20  daughter.

21        Grant it, he's here because of his own

22  actions.  I'm not saying that he's not.  But he is a

23  person who really has an opportunity.  Ten years from

24  now, if you look back, if he receives a favorable

25  probation -- whatever that may mean.  If all he can do

1  in a seven-day week is go to work from 8:00 to 6:00 and

2  come home and he can support his daughter and she can

3  come see him every couple of weeks or once a month like

4  she does now, that makes a tremendous difference in his

5  life.  If he can hold on to this job that he's had for

6  several years and done well at and is a thriving

7  company and that he will continue to do well at --

8  hopefully, when we look back ten years from now and we

9  say -- you know, if he's fortunate enough to receive a

10 sentence that allows him to do that and allows him to

11 take care of and see his daughter, you won't see him

12 back in this court or any other courtroom.  It could

13 make a significant difference in his life as opposed to

14 going in the other direction.

15          So we ask that the Court sentence him to

16 probation, whether that means home confinement or some

17 level of a halfway house where he can just go to work

18 every day and keep doing what he's doing but remain out

19 of prison.

20          Thank you, Your Honor.

21          THE COURT:  Thank you.

22          Mr. Stein, you have the opportunity to

23 address the Court before it imposes sentence if you

24 would like to say anything, sir.

25          THE DEFENDANT:  Your Honor, I'm not very good

1  at speaking in public forums.  So excuse me if I

2  fluster a little bit.

3           First off, I am terribly sorry for getting

4  involved in this criminal endeavor.  I have no words

5  for remorse that I feel for -- and I apologize to the

6  Court and to the country, I guess, which laws I

7  evidently broke.

8           The last eight months since my arrest have

9  been quite difficult.  I've been labeled now, well,

10 pretty much for life, I guess, as a felon, which has

11 tarnished my reputation, of course.  But worst of all,

12 it has an effect on my daughter.

13          I used to travel to Toronto every other

14 weekend to see her for the last nine years since I

15 moved down to Baltimore for the job that I currently

16 have.  Obviously, I can't do that now.  That has been

17 tremendously difficult on her.  She is able to come

18 down here and visit me from time to time.  With the

19 prospect of me possibly being incarcerated, she is -- I

20 mean, needless to say, I am nervous; however, she is

21 especially nervous.  I would ask Your Honor to have

22 mercy on my daughter and I so that I could continue to

23 see her and provide for her.

24          Thank you.

25          THE COURT:  Have a seat for a moment, please.

1          This matter is before the Court for

2    sentencing in the case of *United States v. Hanoch David*

3    *Stein* with respect to his convictions for conspiracy,

4    in violation of Title 18, United States Code,

5    Section 371, which is a Class D felony, punishable by

6    up to 5 years in prison, a $250,000 fine, full

7    restitution, a $100 special assessment, and 3 years of

8    supervised release; and also as to Count 24 of the

9    indictment charging unlicensed wholesale distribution

10   of prescription drugs, in violation of Title 21, United

11   States Code, Sections 331(t), 333(b)(1)(D), and

12   353(e)(3)(B), which are Class C felonies, punishable up

13   to 10 years in prison, a $250,000 fine, full

14   restitution, a $100 special assessment, and 3 years of

15   supervised release.

16          This 37-year-old defendant was involved in

17   the illegal importation and distribution of misbranded

18   drugs for distribution and sale to doctors, medical

19   practices, and hospitals in the United States.  On

20   December 3, 2014, a 25-count indictment was issued

21   against him and others charging him in eight counts

22   with conspiracy to defraud the United States, to import

23   misbranded drugs, to engage in money laundering, and

24   also the substantive offenses of unlicensed wholesale

25   distribution of misbranded drugs.

1              He was arrested on December 24, 2014, in

2    Maryland and was released on personal reconnaissance

3    with conditions which he has complied with.  On May 7

4    of this year, the defendant pled guilty to Counts 1 and

5    24 charging conspiracy and unlicensed wholesale

6    distribution of prescription drugs.

7              The Court has reviewed the guideline sentence

8    applicable to this defendant and this offense.  The

9    Court has also considered in that regard the objections

10   of the defendant who objects to paragraph 51 of the

11   presentence report, which he seeks to strike, as well

12   as seeking a minor role reduction in the offense level,

13   and the further objection to the use of gross proceeds

14   as the proxy for economic loss to victims, and the

15   2-level enhancement for fraudulent scheme that involved

16   a substantial amount of conduct outside the United

17   States.

18             The Court has reviewed the information

19   available to it, including the statements of facts

20   submitted under oath by the defendant, as well as the

21   other nonobjected to information in the PSR and the

22   applicable guidelines and commentary and, based on that

23   information, overrules these objections.

24             Let me speak specifically to the loss

25   enhancement based on gross sales.  The commentary makes

1  clear that in this kind of a context involving

2  regulatory fraud, the gross sales is to serve as the

3  proxy for loss to the victims.  The Court believes that

4  under the commentary and the rules, that amount is

5  required to be used.  The Court will discuss in a

6  moment, however, the extent to which the Court believes

7  that's an appropriate reflection of this defendant's

8  culpability.

9           Based on those rulings, the Court calculates

10  the guideline sentence as follows:  The base level is 6

11  increased by 20 levels to reflect the loss amount based

12  on gross sales of approximately $14 million.  A 2-level

13  increase is also appropriate since a significant part

14  of the conspiracy did occur outside of the United

15  States resulting in an overall offense level of 28.

16  The defendant, in the Court's view, is entitled to a

17  2-level reduction for acceptance of responsibility --

18           Am I correct the government has not moved for

19  a third level?

20           MR. DWYER:  That's correct, Your Honor,

21  because the plea was only a week before trial.

22           THE COURT:  -- resulting in an overall

23  offense level of 26, the guideline sentence for which

24  is 63 to 78 months.  The defendant is eligible for

25  probation under the statutes but not under the

1  guidelines.  Supervised release is recommended at 1 to

2  3 years, a fine of $12,500 to $125,000 with a $100

3  special assessment as to each count.

4           The Court has also reviewed the sentencing

5  objectives under Section 3553 against the information

6  available to the Court.  In that regard, the overall

7  conspiracy in this case began in approximately April

8  2011 and continued through the defendant's arrest in

9  December 2014 all for the purpose of smuggling into the

10 United States and distributing within the United States

11 misbranded prescription drugs and devices.

12          The members of the conspiracy were located in

13 both Canada and the United States and purchased from

14 coconspiring foreign suppliers prescription drugs and

15 devices manufactured and labeled for use in foreign

16 countries, including the Republic of Turkey, Canada,

17 France, Italy, United Kingdom, and other countries.

18 They then caused them to be shipped into the United

19 States, often through circuitous routes.

20          These illegally imported drugs included

21 orthopedic injections, rheumatology infusions, cosmetic

22 devices, optomology products, and oncology drugs,

23 including numerous drugs that required temperature

24 controls during shipment and storage, including Botox

25 and other drugs, including drugs that were injectable

1  prescriptions.

2        In order to avoid the regulatory functions of

3  the FDA, Customs and Border Patrol and Immigration and

4  Customs Enforcement, members of the conspiracy engaged

5  in a variety of actions, including breaking up large

6  shipments of prescription drugs and devices into

7  smaller separate packages to be sent to the United

8  States to multiple locations under multiple names over

9  multiple days to be consolidated upon arrival after

10 evading border detection, shipping packages through the

11 United Kingdom-based services that allow packages to be

12 delivered through the United Postal Service with less

13 scrutiny, including on customs forms misleading

14 statements about the package contents and value, and

15 addressing packages to members of the conspiracy under

16 false name and titles, and frequently mishandling

17 prescription drugs subject to strict temperature

18 requirements, such as cold chain products required to

19 be kept at a constantly low temperature for safe use,

20 and failing to keep and provide appropriate records to

21 track the proper shipping, storage, and transaction

22 histories of the prescription drugs.

23        The misbranding of these smuggled and

24 distributed prescription drugs and devices included

25 inadequate descriptions for their use, FDA black box

1   warnings, which are the strongest warnings the FDA

2   requires, as well as failure in some instances to bear

3   information in the English language.

4            Once in the United States, the drugs were

5   forwarded to doctors, medical practices, or alternate

6   locations, including the personal residences and

7   mailboxes of conspiring individuals known as

8   drop-shippers in the United States.  These

9   drop-shippers regularly received packages of

10  prescription drugs and devices, removed the labels and

11  other *indicia* showing they had been imported from

12  abroad, repackaged the orders, and then reshipped them

13  to doctors and medical practices throughout the United

14  States in order to give the false impression that the

15  drugs were being distributed domestically and legally.

16           Overall, the conspiracy caused to be

17  illegally imported and distributed misbranded

18  prescriptions drugs and devices into the United States

19  amounting to approximately $33 million with this

20  defendant receiving, storing, and reshipping in the

21  United States approximately $14 million in gross

22  proceeds.  He personally received approximately

23  $174,000 for his services.

24           The defendant served as the primary

25  individual drop-shipper on behalf of Defendants SB

1  Medical, Inc., and TC Medical Group operating out of

2  his residence in Baltimore.  In that role, his

3  residence served as a collection point to receive large

4  quantities of misbranded drugs and devices from abroad

5  or other drop-shippers.  He would then repackage and

6  reship those misbranded drugs and devices throughout

7  the United States.

8           He often used a false name in connection with

9  his activities and was effectively coordinating various

10 shipments into the United States before they were

11 redistributed.

12          He was involved in the scheme and conspiracy

13 since at or near the beginning of the conspiracy and

14 worked with the leader of the scheme in the initial

15 startup phases of the scheme.  Whatever may have been

16 the defendant's initial assumptions about the legality

17 of what he was doing, there's no doubt that he quickly

18 understood what he was doing was improper and illegal

19 and continued to expand his activities, nonetheless,

20 over time with what would appear to be rather

21 comprehensive knowledge concerning the overall scope

22 and operation of the scheme.

23          He received letters from the FDA dated as

24 early as November 2 and December 8, 2011, advising that

25 certain drugs had been detained as unapproved by the

1  FDA.  He continued, nonetheless, and functioned as an

2  unlicensed wholesale distributor of these misbranded

3  drugs.  In that capacity, he failed to adhere to

4  appropriate storage and handling, record keeping, and

5  reporting requirements that is required of lawfully

6  licensed wholesalers.

7        Rather than the required facilities, the

8  defendant used storage and handling facilities that had

9  inadequate lighting, ventilation, temperature,

10  humidity, and security as required for the safe

11  handling and the storage of prescription drugs and

12  devices.

13        He has no formal training or experience in

14  the handling of prescription drugs and devices and did

15  not properly quarantine damage, deteriorated,

16  misbranded, adulterated, or even counterfeit or

17  prescription drugs.

18        There's no doubt that the defendant was

19  involved in a large scale scheme that functioned to

20  defraud the United States and its agencies by impeding,

21  impairing, and defeating the lawful functions of the

22  FDA to protect the health and safety of the public by

23  ensuring that prescription drugs and devices

24  distributed in the United States were safe and

25  effective from the time of manufacturing until delivery

1  to the entity that sold or dispensed the product to the

2  ultimate consumer or patient.

3          The Court has no doubt that the defendant's

4  activities substantially contributed to the ability of

5  these companies to successfully import and distribute

6  these misbranded and improperly transported and stored

7  drugs and that he did so knowing that what he was doing

8  was illegal and that, as a result, he substantially

9  contributed to the distribution of drugs and devices

10 that threatened the public safety.

11         Nevertheless, without minimizing the

12 defendant's role, the Court has also considered, in

13 connection with assessing the level of culpability,

14 that while he was substantially involved over an

15 extended period of time, he was not, in fact, a leader

16 of the conspiracy.  He did not participate in the

17 planning, marketing, or selling of the drugs and

18 devices and that he acted essentially at the direction

19 of others and that his financial benefit was limited

20 relative to others.

21         This is the defendant's first involvement in

22 the criminal justice system.  The Court has considered

23 the information and materials that have been provided

24 concerning his background, including the many letters

25 it has received from family and friends.

1           Against this background and information, the
2  Court has considered the guideline sentence, the extent
3  to which it appropriately reflects the level of
4  culpability of this particular defendant.  In that
5  regard, the Court has considered that the guideline
6  sentence is substantially driven by the $14 million
7  figure used to calculate the loss amount even though
8  that amount does not reflect any particular loss.
9           The Court has also considered that in other
10  contexts, the defendant's gain of approximately
11  $174,000 would be used to calculate the guideline
12  sentence, and the Court has considered the guideline
13  sentence were it calculated on that basis.
14           The Court has also considered the need in
15  this case for general and specific deterrence.  With
16  respect to specific deterrence, the Court has
17  considered the defendant's background and the prospects
18  for recidivist behavior, which the Court assesses as
19  low.  With respect to general deterrence, the Court has
20  considered the public interest, the role the defendant
21  played within the scheme, the dangers presented to the
22  public by the distribution of these drugs in the
23  fashion that they were, and the defendant's substantial
24  role in the improper storage and domestic distribution
25  of those drugs, including the volume of drugs

1   distributed, the length of time he performed those

2   activities, and his continued involvement in those

3   activities after clear and unmistakable warnings that

4   his activities were illegal.

5            Overall, the Court has considered the extent

6   to which alternative sentences can satisfy the

7   sentencing objective.

8            The Court has also considered the defendant's

9   age and the need to avoid unwarranted sentencing

10  disparities.  In that regard, the Court has considered

11  the defendant's level of culpability relative to others

12  in the conspiracy, the sentence already imposed on a

13  coconspirator, and also the sentences imposed in other

14  cases of this type both within this court and

15  elsewhere.  The Court has also considered his level of

16  involvement and culpability relative to the other

17  drop-shippers that the Court has already sentenced.

18           Finally, the Court has considered the

19  defendant's acceptance of responsibility.

20           The Court is in a position to impose sentence

21  at this time.

22           Mr. Stein, will you come to the podium,

23  please.

24           Mr. Stein, it will be the sentence of this

25  Court you be committed to the Bureau of Prisons for a

1   period of 8 months, following which you'll be placed on

2   1 year of supervised release under the standard terms

3   and conditions, including that you'll participate in

4   any programs for substance abuse or mental health

5   treatment that the government may require.  The Court

6   will impose a $200 special assessment due and payable

7   immediately.  The Court will not impose a fine in light

8   of the restitution obligation that you have.  That will

9   be the sentence of the Court.

10          Is there anything further?

11          MR. CASPER:  Your Honor, we just request two

12  things:  One, that he have a 90-day self-surrender

13  given the --

14          THE COURT:  Is there any objection to

15  voluntarily surrender?

16          MR. DWYER:  No objection, Your Honor.

17          THE COURT:  All right.  The Court will allow

18  the defendant to voluntarily surrender to the Bureau of

19  Prisons at a time and place to be designated for him

20  through the Pretrial Services and Probation office

21  under whose supervision he'll remain until he reports

22  to the Bureau of Prisons.

23          MR. CASPER:  Thank you.

24          The only other remaining matter is due to his

25  religious affiliation, we request that the Court make a

1  recommendation of Otisville, New York, so he can

2  continue to be in the best possible scenario for his --

3          THE COURT:  I'm sorry.  Where in New York?

4          MR. CASPER:  Otisville, New York.

5          THE COURT:  All right.  The Court will make

6  that recommendation to the Bureau of Prisons if it's

7  available and appropriate.

8          MR. CASPER:  Thank you, Your Honor.

9          THE COURT:  All right.  Anything further?

10         MR. DWYER:  Your Honor, the government has a

11 consent order of forfeiture that we would pass up with

12 the help of the court security officer.  It has been

13 signed by the defendant, defense counsel, as well as

14 the government.

15     (Documents are handed up to the Court.)

16         THE COURT:  The Court has entered the consent

17 order of forfeiture.

18         All right.  Thank you.

19         Counsel and the defendant are excused.

20         MR. CASPER:  Thank you, Your Honor.

21         -----------------------------------
                   Time:  10:10 a.m.
22
       I certify that the foregoing is a true and
23
        accurate transcription of my stenographic notes.
24
                        _____
                                /s/
25                      Rhonda F. Montgomery, CCR, RPR


       Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599